**Opinion filed May 31, 2018**



**In The**

# Eleventh Court of Appeals

_____

## No. 11-16-00110-CV

_____

## DIANA GODINES, INDIVIDUALLY AND ON BEHALF OF AMANDO GODINES, SR., DECEASED; MICHAEL GODINES; AMANDO GODINES, JR.; AND DEANNA QUITUGUA, Appellants

## V.

## PRECISION DRILLING COMPANY, L.P., Appellee

**On Appeal from the 238th District Court**
**Midland County, Texas**
**Trial Court Cause No. CV-52178**

## MEMORANDUM OPINION

Appellants, the surviving spouse and children of Amando Godines, Sr.,[1] sued Precision Drilling Company, L.P., among others who are not parties to this appeal, for wrongful death under negligence and gross negligence theories. Precision

---

[1]Godines died while working for Precision Drilling Company, L.P. as a motorman on the rig crew.

answered the suit and moved for summary judgment on traditional and no-evidence grounds.  Precision argued that (1) proof of its status as a workers' compensation subscriber conclusively barred the negligence claim and (2) Appellants produced no evidence of gross negligence—no evidence of Precision's awareness of the risk, of a vice principal's gross negligence, or of proximate cause.  The trial court granted summary judgment for Precision, and on appeal, Appellants raise four issues.  We affirm.

## I. *Summary Judgment Evidence*

Precision worked with a trucking company, Briley Trucking, Ltd., to move an oil and gas rig from one well site to another.  At the original well site, Briley sought approval from Precision to transport the derrick using the "two-truck method," in which the derrick was only partially collapsed (or "scoped in") and moved using two trucks.  Because the derrick dolly needed repairs, the two-truck method provided Precision a way to move the rig more quickly.  Precision supervisors, Benjamin Franco and Salvador Ulloa, raised concerns with the Briley "truck pusher" that moving the derrick in this manner was dangerous.  The Briley truck pusher and Precision supervisors called Precision's drilling superintendents, Roger Dean Moran and Roel Soza, to discuss the move.  After the Briley truck pusher told Moran that he could perform the move safely, the superintendents approved the two-truck method.

To prepare the rig move, two tractor-trailers trucks were backed up to one another.  Briley and Precision partially collapsed sections of the derrick and secured them using pins.  The derrick rested horizontally on both trailers, with one truck facing forward and the other truck facing backwards.  Briley drove the rig over ten miles on a highway and rough lease roads to the new well site.

When the trucks arrived at the new well site, the suspension equipment was not ready for the derrick.  The Precision crew was using the crane for tasks involved

2

with building the substructure of the rig. Precision and Briley supervisors testified that they planned to finish the substructure, have a "Job Safety Analysis" (JSA) meeting, and then suspend the derrick with either the crane or the pole trucks. The parties dispute whether a JSA meeting took place before the crew "scoped in" the derrick at the original well site, but the parties agree that no JSA meeting occurred to discuss "scoping out" the derrick at the new well site. The derrick remained on the tractor-trailers for almost two hours while the Precision crew worked on the substructure.

At some point, the Briley truck pusher at the new well site had a radio conversation about the status of the derrick, and he walked toward the derrick to check the "diaper pins," which held the larger pins in place under the derrick. The truck pusher testified that he picked up a sledgehammer and was only going to remove the diaper pins, as opposed to the larger pins, and that Godines insisted on removing the diaper pins because it was his job. The truck pusher also testified that Godines took the sledgehammer, but another Precision crew member testified that the truck pusher gave it to him. Other testimony also suggested that the Briley truck pusher instructed Godines to remove the pins. In any event, all Precision supervisors testified that the derrick was not ready to scope out and that they did not instruct Godines to check the pins.

Godines was fatally injured after he positioned himself underneath the derrick and removed one of the load-bearing pins. After Godines removed the pin, the remaining pin sheared off and the derrick collapsed on top of him.

## II. *Issues Presented*

On appeal, Appellants' first issue is a global issue, which asks whether the trial court erred when it granted summary judgment. In the second issue, Appellants assert that the trial court erred when it considered late-filed evidence. Third, Appellants argue that the evidence precludes summary judgment on no-evidence

3

grounds. Finally, Appellants argue that Precision failed to meet its burden on traditional grounds.

### III. *Analysis*

We first consider Appellants' second and fourth issues concerning the late-filed summary judgment evidence and its effect on the negligence claim. Then we consider the first and third issues related to the no-evidence summary judgment on the gross negligence claim.

> A. <u>*Issues Two and Four*</u>: *The trial court did not abuse its discretion when it granted leave to file the workers' compensation policy late, and the exclusive remedy provision of the Texas Workers' Compensation Act bars Appellants' negligence claim.*

In their second issue, Appellants argue that the trial court improperly considered Precision's late-filed summary judgment evidence. Because of that, in their fourth issue, Appellants assert that Precision failed to conclusively establish that it was covered by workers' compensation insurance and that the exclusive remedies provision barred their negligence claim.

### *1. Second Issue--Standard of Review*

"Summary judgment evidence may be filed late, but only with leave of court." *Benchmark Bank v. Crowder*, 919 S.W.2d 657, 663 (Tex. 1996) (citing Tex. R. Civ. P. 166a(c)). The standard of review for a trial court's decision to admit or exclude a late summary judgment response is abuse of discretion. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 686 (Tex. 2002). Admission of late summary judgment filings are appropriate "upon a showing of (1) good cause, and (2) no undue prejudice." *Marino v. King*, 355 S.W.3d 629, 633 (Tex. 2011); *Wheeler v. Green*, 157 S.W.3d 439, 442 (Tex. 2005); *Carpenter*, 98 S.W.3d at 686–88; *Burleson v. Sharp Image Energy, Inc.*, No. 11-06-00069-CV, 2007 WL 3298973, at *4 (Tex. App.—Eastland Nov. 8, 2007, pet. denied) (mem. op.). "It is appropriate

4

for the trial court to grant leave for the late filing of summary judgment proof when the summary judgment movant is attempting to counter arguments presented in the nonmovant's response." *Garcia v. Garza*, 311 S.W.3d 28, 36 (Tex. App.—San Antonio 2010, pet. denied) (citing *Lawler v. Dallas Statler-Hilton Joint Venture*, 793 S.W.2d 27, 30 (Tex. App.—Dallas 1990, writ denied)).

### 2. *The trial court did not abuse its discretion when it considered late-filed evidence.*

Precision moved for summary judgment and attached the affidavit of a risk manager to prove that it was covered by a workers' compensation policy at the time of Godines's death. Appellants filed a response and argued that Precision failed to meet its burden because it did not attach the workers' compensation policy to the summary judgment motion. Then, on the day before the summary judgment hearing, Precision filed a motion for leave to supplement its evidence and attached the policy. The policy listed Precision as covered on a rider to the information page.

Appellants objected to the late filing, arguing that the length of the document and the time of filing prevented them from identifying potential problems with the coverage. Precision responded that filing the actual policy was unnecessary but that it sought to supplement the evidence as a precaution. Precision argued that Appellants did not suffer prejudice because Precision's attorneys notified them about the policy two days after the accident and they had attempted to file a beneficiary claim under the policy. Precision produced e-mail correspondence between the attorneys for Precision and Appellants and also produced the beneficiary-claim form that Diana Godines had filed. The trial court sustained Appellants' objection at the hearing but then later issued a written order that granted Precision leave to supplement the record. On the same day, the trial court granted summary judgment in Precision's favor.

5

The trial court acted within its discretion to grant Precision leave to file late evidence. The trial court could have reasoned that Precision had good cause to file the workers' compensation policy late because it was a response to Appellants' argument that the initial affidavit from the risk manager was insufficient. The trial court could have also inferred from the e-mail correspondence and beneficiary claim that Appellants would not have suffered surprise from the late filing. Therefore, we cannot say that the trial court abused its discretion when it granted Precision leave to file late summary judgment evidence.

Appellants also argue that, because the trial court sustained the objection to the late-filed evidence at the summary judgment hearing, the trial court should not have considered the workers' compensation policy. But "[a] trial court has the inherent authority to change or modify any interlocutory order or judgment until its plenary power expires." *Loy v. Harter*, 128 S.W.3d 397, 409 (Tex. App.—Texarkana 2004, pet. denied); *see Fruehauf Corp. v. Carrillo*, 848 S.W.2d 83, 84 (Tex. 1993); *see also* TEX. R. CIV. P. 329b(d). Therefore, even after it initially sustained Appellants' objection, the trial court had the authority to change its mind and grant the motion to admit late-filed evidence.

### 3. Workers' compensation is the exclusive remedy, and Appellants' negligence claim is barred.

"Recovery of workers' compensation benefits is the exclusive remedy of an employee covered by workers' compensation insurance." *City of Bellaire v. Johnson*, 400 S.W.3d 922, 922 (Tex. 2013) (quoting TEX. LAB. CODE ANN. § 408.001(a) (West 2015)). To prove this affirmative defense on summary judgment, the movant must conclusively establish that it maintained workers' compensation insurance. *Garza v. Exel Logistics, Inc.*, 161 S.W.3d 473, 474–75 (Tex. 2005); *Morales v. Martin Res., Inc.*, 183 S.W.3d 469, 471 (Tex. App.—Eastland 2005, no pet.).

The "information page of a workers' compensation policy" and an affidavit by a risk manager who maintains that the coverage was effective at the time of the incident is sufficient to prove that an employer maintained workers' compensation insurance. *E.g.*, *Martinez v. H.B. Zachry Co.*, 976 S.W.2d 746, 748 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (holding that the affidavit of a "claims manager" coupled with the information page of the policy established coverage). Here, Precision produced an affidavit by its risk manager stating that it maintained workers' compensation insurance at the time of Godines's death. Then Precision supplemented its evidence with the full policy, which included an information page listing Precision as a covered entity. This evidence conclusively established that Precision maintained workers' compensation insurance. The trial court was within its discretion to consider the late-filed policy, which conclusively proved that the exclusive remedy provision of the Texas Workers' Compensation Act applies. We overrule Appellants' second and fourth issues.

    B. *Issues One and Three: The trial court properly granted summary judgment on Appellants' gross negligence claim because Appellants failed to adduce evidence that raised a genuine issue of material fact that Precision was consciously indifferent to Godines's safety.*

We now turn to the no-evidence summary judgment on Appellants' gross negligence claim. The standard of review for summary judgment is the same for gross negligence as for ordinary negligence. *See Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 423 (Tex. 2000); *Hardy v. Bennefield*, 368 S.W.3d 643, 648 (Tex. App.—Tyler 2012, no pet.). Because the trial court did not specify the basis of its ruling, we will affirm the judgment of the trial court if any of the movant's theories are meritorious. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989); *Barker v. Roelke*, 105 S.W.3d 75, 82 (Tex. App.—Eastland 2003, pet. denied).

7

### 1. *Standard of Review*

We review summary judgment motions under a well-settled, multifaceted standard of review. *Kemp v. Jensen*, 329 S.W.3d 866, 868 (Tex. App.—Eastland 2010, pet. denied). Summary judgments are reviewed de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The party that files a no-evidence motion for summary judgment alleges that there is no evidence of one or more essential elements of a claim or defense on which the adverse party would have the burden of proof at trial. *See* Tex. R. Civ. P. 166a(i). A no-evidence motion for summary judgment is essentially a motion for a pretrial directed verdict. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 581–82 (Tex. 2006) (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). Once such a motion is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. *Id.*

### 2. *Appellants failed to adduce evidence that raised a genuine issue of material fact that an act or omission by a vice principal of Precision proximately caused Godines's death.*

Precision moved for summary judgment on no-evidence grounds because it asserted that there was no evidence to establish an act or omission by a Precision vice principal that proximately caused Godines's death. In response, Appellants produced four expert affidavits, two affidavits by Franco, and various deposition testimony.

Several witnesses provided evidence in either affidavits or depositions. Dr. Jahan Rasty, a mechanical engineering expert, concluded that the pin on the opposite side of the derrick fractured after Godines removed the first pin, which caused the collapse. John P. Hughett, an engineering and oilfield operations expert, stated that the rig manufacturer published a manual for moving the rig and that the two-truck method is against the recommended practice. Hughett concluded that

8

Precision ignored these dangers, that Precision "failed to see that the pins were installed in the correct direction," and that Precision "failed to properly train its rig crew on mast rig down and rig up operations." Matthew Meyerhoff, a motor carrier consultant, outlined reasons that he believed that the two-truck method violated its permit and transportation regulations. He opined that Precision's decision to transport the rig using the two-truck method was "made based upon the quickest way to get the oil rig up and running." He also stated that the decision prioritized "profits over safety and created an extreme degree of risk of harm to all personnel involved in the transportation of the derrick." Appellants' expert, Gary S. Nelson, described the elements of a workplace safety program and the JSA process. Specifically, if Precision had used a derrick dolly, "the rig would have to have been triple scoped to accommodate its use, and since a derrick dolly cannot be used to scope out a rig, then the rig would have automatically been supported by pole/gin trucks before scope out." However, none of these individuals were vice principals of Precision, and none testified that a Precision supervisor had proceeded to "unscope" the rig or had instructed Godines to do so.

Precision's superintendent, Moran, who approved the two-truck method, confirmed that JSA meetings are required before scoping in or scoping out a rig and that a failure to perform a JSA "likely will lead to significant harm and injury on a work site." Moran testified that the rig manager on site is responsible for ensuring that a JSA meeting occurs. Precision does not train its rig managers in a single safe way to move a rig; instead, "they have a rig move plan . . . that they get with the trucking company" who moves the rig. The rig managers and the trucking company jointly create guidelines for a rig move at the job site. The rig manager is the Precision supervisor who is responsible for "[a]ll safety issues," and Ulloa was the rig manager for Rig 305.

9

Precision still needed to move the derrick from where it was parked to the location where "it was going to be pinned into position and raised." Setting up an oil and gas rig is a process with several steps, and Franco confirmed that he "follow[ed] the typical steps that you follow in setting up the pieces of the rig necessary to put it in position." When asked about whether the rig manager would take instructions from a third party, Moran testified that the rig manager might have taken direction from a truck pusher in some circumstances. When asked about whether Precision's protocol would have allowed a third party to instruct a Precision employee, Moran said, "[T]hey do job tasks if everything is done safely. We've -- we've taken instruction from [a] third party." Regarding Godines, Moran testified that "on a critical task you have to . . . get the rig manager involved. And he wasn't aware of the job task that was being done."

Precision created a JSA for scoping out Rig 305 a couple of years before Godines's death. Although Ulloa knew about the written JSA and the "risk potentials" that it listed, he did not use it. Ulloa maintained that he did not hold a verbal JSA at the new well site because *it was not yet time to scope out the derrick*. Moran also testified that Precision *was not ready to scope out the derrick at the time of the accident*, and he consistently maintained that Precision supervisors did not know that anyone was scoping out the derrick.

Franco, who was a driller for Precision, stated that Precision "knew that having people work around the derrick without it being supported with pole trucks, stands or a crane was extremely dangerous." According to him, "[t]here was no reason for anyone to be near the rig" while the crane or pole trucks were not in place. In his deposition, Franco stated that Precision *was not ready to scope out the rig* at the time of Godines's death. When asked whether the derrick "pose[d] any danger to anybody while it was just parked" at the new well site, Franco said, "No, sir."

10

When asked how many crew members it would take to safely scope out the derrick, Franco replied, "As many as possible." He confirmed that Godines could not have scoped out the rig alone. Franco characterized Godines as an experienced worker who had worked in the oilfield most of his life, and Franco said that he did not instruct Godines to check the pins. Franco blamed himself for the accident because he supervised Godines and he "wasn't there to stop" him. Franco testified that he and the other crew members did not see Godines strike the pin under the derrick because they were doing other tasks.

Eduardo Quezado, a Precision floor-hand employee, saw Godines underneath the derrick striking the pin, but he did not realize Godines was performing a dangerous task. Quezado testified that the radios were only used by the Briley truck pushers, not Precision.

In sum, Precision argues that none of this evidence shows that a vice principal of Precision proximately caused Godines's death or that any negligent act amounted to gross negligence. Even if we assume, without deciding, that Moran, Ulloa, Franco, and Quezado were all vice principals of Precision, we conclude that there was no evidence that raised a genuine issue of material fact that any Precision supervisor's acts or omissions proximately caused the accident and Godines's death.

Appellants suggest that Precision knew that using the two-truck method was likely to damage the derrick mast during transportation and risk collapse. Appellants' experts' affidavits support the assertion that moving a rig in this way can cause damage to the derrick, but there is no evidence that any such damage actually caused the collapse. A plaintiff must prove all the elements of negligence as a prerequisite to a gross negligence claim. *Gonzalez v. VATR Constr. LLC*, 418 S.W.3d 777, 789 (Tex. App.—Dallas 2013, no pet.); *Barnes v. United Parcel Serv., Inc.*, 395 S.W.3d 165, 176 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (citing *Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue*, 271 S.W.3d 238, 246 (Tex.

11

2008)). A necessary element of negligence is proximate cause, which requires proof of "cause in fact." *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004). "Cause in fact" means that the act or omission was a substantial factor in bringing about the injury, and without it harm would not have occurred. *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992).

Dr. Rasty indicated in his affidavit that the two-truck method was a factor contributing to stresses on the failed travel pin, but he also stated that further analysis would be needed "to quantify the contribution of transportation-induced stresses" on the pins. Hughett's affidavit stated that the two-truck method could cause damage to the derrick mast, and Meyerhoff averred that the two-truck method was dangerous because it violated motor carrier regulations.

We agree with Precision that these affidavits do not raise a genuine issue of material fact on a causal connection between the risks of transportation and Godines's death. The parties do not dispute that the derrick collapsed after Godines removed one of the travel pins. None of the experts' statements indicate that a single pin—even one in brand new condition—could have supported the weight of the derrick. Appellants failed to adduce evidence that raised a genuine issue of material fact that the transportation method damaged the derrick's pins and substantially contributed to Godines's death.

> 3. *Appellants failed to adduce evidence that raised a genuine issue of material fact that Precision was consciously indifferent to the extreme risk that created the likelihood of serious injury to Godines.*

Gross negligence has two elements: an objective and a subjective element. *U-Haul Int'l Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012); *Matbon, Inc. v. Gries*, 288 S.W.3d 471, 488 (Tex. App.—Eastland 2009, no pet.); *see* TEX. CIV. PRAC. & REM. CODE ANN. § 41.001(11) (West Supp. 2017). For the objective element, the evidence must show that, from a vice principal's perspective, an "act or omission

involved an extreme degree of risk" that created "the likelihood of the plaintiff's serious injury." *U-Haul*, 380 S.W.3d at 137. The subjective element requires that the defendant's vice principal was aware of the risk but "demonstrated indifference to the consequences of its acts." *Id.* "Circumstantial evidence is sufficient to prove either element." *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001). "Some evidence of simple negligence is not evidence of gross negligence. Conversely, some evidence of care does not defeat a gross-negligence finding." *Id.* (citations omitted). But "a party cannot be liable for gross negligence when it actually and subjectively believes that circumstances pose no risk to the injured party, even if they are wrong." *U-Haul*, 380 S.W.3d at 141.

In *Andrade*, the plaintiff failed to produce any evidence that the defendant's managers were consciously indifferent to the risk of electrocution by an energized crane. *Louisiana-Pac. Corp. v. Andrade*, 19 S.W.3d 245, 248 (Tex. 1999). The defendant knew that its managers "had the responsibility to de-energize the rails and lock out the power source" of a crane, and the managers presented conflicting testimony about "when the power was actually turned off." *Id.* at 247. However, the conflicting testimony about when the managers thought they locked out the crane did not create an inference that the defendant's managers "knew the crane was energized that day and nevertheless did not care whether" the employees "would encounter that risk." *Id.* at 248. Neither did "the failure to maintain a written lock-out policy" show that the managers were consciously indifferent to the risks posed by the crane. *Id.* The managers were not consciously indifferent because "they actually, subjectively believed that they had locked out the crane or witnessed someone else do so before" the injured employee began to work. *Id.*; *see Diamond Shamrock Ref. Co. v. Hall*, 168 S.W.3d 164, 172 (Tex. 2005) (holding there was no evidence the defendant was conscious that a "compressor was unsafe as designed

13

and operated," although the defendant's efforts to protect against the dangers of working in an oil refinery were "imperfect" and "may have been negligent").

In contrast, the plaintiffs in *Burk Royalty* produced circumstantial evidence that the district superintendent of an oil well site was consciously indifferent to the risk of a fire on a rig. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911, 922–23 (Tex. 1981). An oil rig crew member was burned to death when gas ignited while he was "pulling wet tubing from an oil well." *Id.* at 914. Before the crew began this job, the rig operator asked the superintendent whether they should use "a process called 'shooting the tube.'" *Id.* The superintendent told the operator "not to use that method, but rather to pull the tubing until they reached fluid," which he knew was flammable. *Id.* at 914, 923. The crew smoked around the oil well and kept a fire burning about thirty feet away. *Id.* at 923. But the superintendent "did not check for safety conditions or safety violations, and he did not give any safety instructions" after he told the operator to pull the wet tubing. *Id.* at 923. A corporate officer testified that there were no established safety procedures for pulling wet tubes, and the rig operator "said he didn't know if there were any fire extinguishers on the rig or not." *Id.* The rig operator testified that "no monthly safety meetings were ever held"; thus, the jury could have inferred that other testimony about safety meetings was untrue. *Id.* The superintendent, thus, exhibited conscious indifference because he instructed the crew to perform a task involving a flammable liquid and circumstantial evidence showed that he ignored safety procedures relevant to that task. *See id.*; *see also Lee Lewis*, 70 S.W.3d at 784, 786 (holding that the subjective element of gross negligence was satisfied where a "job superintendent" saw employees working on the ninth floor of a building that was under construction with an "ineffective fall-protection system" and "did nothing to remedy it").

The present case is more like *Andrade* because there was no evidence that a Precision supervisor was conscious that one of its employees was about to scope out

14

the derrick from the two trucks but, nonetheless, allowed the employee to continue doing so without conducting a JSA meeting beforehand. There is no evidence that a Precision supervisor instructed Briley or any employees to begin scoping out the rig. All Precision supervisors, including Franco, testified that it was not yet time to scope out the derrick when Godines went to remove the pins and that the derrick was not in the position to begin that process.

Although Franco testified that he knew it was dangerous to work around the rig, his admission that the derrick did not pose a risk while it was parked on the tractor-trailers shows that he was not subjectively aware of the risk at the time Godines removed the pin. Like the managers in *Andrade* who all testified that they believed that they locked out the crane, all Precision managers subjectively believed that there was no risk to the crew at the particular time that Godines went under the derrick to remove the travel pins. Franco also testified that "[t]he instructions from the truck pusher to Godines were not cleared through" him, and he admitted that there was no reason for his crew to be around the derrick at that time.

Furthermore, Godines was an experienced employee with the authority to stop work if he thought an activity was unsafe. Employee experience and "stop work authority" are factors that decrease the foreseeability that a worker would encounter an extreme risk without specific instructions. *See Petri v. Kestrel Oil & Gas Props., L.P.*, 878 F. Supp. 2d 744, 768 (S.D. Tex. 2012) (holding that there was not clear and convincing evidence that the employer was subjectively aware that an experienced worker with stop work authority "would miscalculate the danger, not comply with company safety standards, nor use a readily available life vest, despite the clear sign requiring it, nor exercise his stop work authority").

Appellants argue that circumstantial evidence indicates that Precision was aware that the process of scoping out the derrick had begun. Another Precision employee, Quezado, was in the area around the derrick when Godines went to

15

remove the pins, and Quezado heard the Briley truck pusher discuss scoping out the derrick on his radio. However, Quezado testified that he was working on the mud boat nearby, and the uncontroverted evidence shows that only Briley truck pushers used the radios. Without evidence that Precision supervisors communicated with Briley or were otherwise aware of Briley's actions, the radio conversation does not raise a question of material fact that Precision supervisors consciously allowed their crew to begin scoping out the rig without a JSA meeting. Standing alone, circumstantial evidence of the proximity of one other employee performing different tasks in the same area is too meager to impute actual awareness to Precision's supervisors. *See Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997) (citing *Blount v. Bordens, Inc.*, 910 S.W.2d 931, 933 (Tex. 1995)). Therefore, these facts do not create the inference that a Precision supervisor was aware that the Briley truck pusher or any employee would begin the process of scoping out the derrick and consciously disregarded the risk to Godines. Appellants failed to adduce evidence that raised a genuine issue of material fact that a Precision supervisor was aware of the risk to Godines and that such supervisor began scoping out the derrick with conscious indifference to Godines's safety. Thus, Appellants failed to raise a genuine issue of material fact on the mental state required to prove gross negligence. We overrule Appellants' third issue.

## IV. *Conclusion*

The trial court did not abuse its discretion when it allowed and considered the late-filed evidence, and the trial court properly granted summary judgment in favor of Precision on Appellants' negligence claim. Because Appellants failed to raise a genuine issue of material fact on one or more elements of their gross negligence claim, the trial court did not err when it granted Precision's no-evidence motion for summary judgment. In light of this court's disposition of Appellants' second, third, and fourth issues, we also overrule Appellants' global first issue.

## V. *This Court's Ruling*

We affirm the judgment of the trial court.

MIKE WILLSON

JUSTICE

May 31, 2018

Panel consists of: Willson, J.,
Bailey, J., and Wright, S.C.J.[2]

---

[2]Jim R. Wright, Senior Chief Justice (Retired), Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.